LEWIS, J.,
dissenting.
I dissent. In my view, while there is certainly a place for the implementation of technology in juvenile proceedings and we must never fear innovation, we cannot elevate the process above substance and we must be ever vigilant to protect and safeguard our youth. The implementation of technology simply because of availability causes a misdirection of our objectives. I *546 do not question the motives and good intentions of those proposing and supporting this modification; however, the majority view concedes that the program approved today depersonalizes the juvenile process, a substituted problem with which I cannot agree. If the goal, as suggested by the majority, is to remedy dehumanizing conditions, this procedure which substitutes a T.V. chamber with glass faces and sound system voices for human contact is an Orwellian prophecy fulfilled, merely substituting one evil for another in the name of technological advancement. If fights, disruptions, and the spectacle of parades in handcuffs and shackles are the ills to be corrected, then we should correct and change these disgraceful problems rather than avoiding correction by attempting to implement robotic justice. The same youth initially forced through the T.V. chamber process for the detention hearing will still face the uncorrected ills because they will return in person for future hearings. This “electronic audiovisual device” we have today approved is without name, description, capacity, or standards of quality. In my view, our youth and our future deserve far more.
We have learned and we have professed that our jurisprudence recognizes juvenile proceedings to be unique and different. See State v. T.M.B., 716 So.2d 269 (Fla.1998). Juvenile proceedings are neither wholly criminal nor entirely civil in nature, with the well-being of the minor in the forefront of all deliberative measures. See, e.g., P.W.G. v. State, 702 So.2d 488 (Fla.1997). We have noted that the State must exercise parental-type intervention and supervision in the lives of troubled youth, and I would choose that the judicial system exercise that responsibility in person and not through mirrors and glass. The detention hearing is a critical stage in the juvenile process which requires an honest judicial assessment of an individual and family in close temporal proximity to an alleged deviant event. At a time such as this, a great deal of information is exchanged by not only the spoken word, but also by personal contact and observations inherent in the personal interaction generated by a personal appearance, qualities missing when an event is perceived only through the limitations of the lens of a camera or television monitor. Most assuredly, the impact of the detention hearing has far reaching tentacles for all concerned, the individual youth, the family, and the public in general. The decision with regard to detention should be made in person, not by long distance.
Secondly, not only are standards and criteria for the equipment to be utilized missing, the provision we approve today is also deceptively silent on its face as to the practical operation of the procedures followed. The amendment states facially that utilization of the electronic device will be applied “in the discretion of the Court.” This suggests and implies that each and every case with its individual circumstances and characteristics will be separately evaluated for the exercise of judicial discretion as a condition precedent to subjecting a child to the T.V. chamber. The concept of judicial discretion generates visions of flexibility with rational and well-reasoned choices formulated from a sense of justice that is individualized and sensitive to the personal needs and circumstances involved. Thoughts of hand-tailored decisions and results that are free from a mass-production mentality ride the wings of true judicial discretion.
The practical operation of the amendment approved today, as described by the amendment proponents during oral argument, is the antithesis of “judicial discretion” which we have historically honored. The proponents proudly proclaim that the discretion embodied in this amendment is exercised only once and then totally without regard to an individualized case. The discretion is exercised on an all or nothing basis because if a particular circuit approves use of an electronic device, all juveniles are condemned to the T.V. chamber, without exception, unless and until some *547 unstated, undefined, non-quantified problem arises while a child is already being subjected to the robotic detention hearing process. In my view, this is not the exercise of judicial discretion at all, but is nothing more than the implementation of a predetermined policy representing a mechanistic approach to problems that need individualized care and attention. See, e.g., Booker v. State, 514 So.2d 1079 (Fla.1987). Where judicial discretion is the stated standard, a mechanical application to produce a singular result should be unacceptable to all. See, e.g., Woosley v. United States, 478 F.2d 139 (8th Cir.1973).
The Florida Public Defender Association has noted that the process contemplated by this amendment will impair the ability of a child to present pertinent information to the court. The reports submitted have not demonstrated that children will be provided an opportunity to communicate fully and completely in privacy with anyone other than a singular defense counsel. It has been suggested that even some of the perceived benefits of time saving may be a direct result of the inability of a child or defense counsel to identify potential information and present relevant factors to a court. It has been suggested that two of the most important factors to impact a discretionary release decision during the detention hearing process are the interaction of a juvenile with parent or guardian and the personal interaction of the juvenile with the presiding judge. The depersonalization of the proposed amendment gives the entire proceeding a mechanical quality which is not conducive to individual justice and creates a sterile atmosphere in which children do not fully understand what has happened to them in the judicial proceeding, and the decision for one’s freedom appears only on a glass screen with a voice resonating through speakers.
Persons involved with child welfare issues have suggested that the children subjected to the T.V. chamber process have a reduced perception of receiving a fair hearing and the children subjected to this appear detached and unemotional even though they are experiencing emotions of concern and fear. Our children must be able to understand what is happening to them and why things are happening, which may be very difficult in the sterile environment of T.V. chamber justice.
I certainly recognize that there are benefits to be found in virtually all well-intended excursions into new methodologies and, to be sure, there are some present with this amendment. However, the dehumanizing quality of requiring our youth to communicate with a T.V. screen during this intensely serious proceeding, one that may alter the balance of a young life, is offensive to me as a lawyer, as a jurist, and as a parent. In my view, a far better approach is that incorporated in Alaska,[5] which affords the juvenile the fundamental right to be physically present in court unless the juvenile consents to make an appearance by way of television, subject to approval by the court. It is this type of provision that allows for flexibility if implementation of the T.V. chamber concept truly benefits the child rather than the system and, at the same time, retains for the child the right to humanized justice. The supporters and proponents of this amendment present the proper “buzz words,” but I cannot overlook that written documentation from virtually every circuit having attempted this type of procedure on a trial basis includes an undercurrent of efficiency and economy which, I fear, is the engine moving the procession. We cannot overlook and must specifically recognize the enormous demands placed on juvenile judges as noted by the majority with regard to caseload statistics. It appears that this Court is in unanimous agreement that we must allocate more judicial resources to our juvenile court system. We all agree that if we are to make a difference, we must place our children first. We should do more, not less, to encourage personal *548 contact and personal attention to our youth, which, in my view, is the only path that will lead to a brighter tomorrow for juveniles who are the tomorrow for Florida.
ANSTEAD and PARIENTE, JJ., concur.

. See Alaska Delinquency Rule 3(e) (1998).